UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADRIAN AKRAM,

               Petitioner,               Case No. 16-11357

v.                                    HON. MARK A. GOLDSMITH

CONNIE HORTON,

               Respondent.

_____/

**OPINION & ORDER
(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING A
CERTIFICATE OF APPEALABILITY, AND (3) GRANTING LEAVE TO PROCEED IN
FORMA PAUPERIS ON APPEAL**

Petitioner Adrian Akram, a Michigan prisoner, filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his Wayne County Circuit Court conviction of first-degree murder, Mich. Comp. L. § 750.316; felon in possession of a firearm, Mich. Comp. L. § 750.224f; and possession of a firearm during commission of a felony, Mich. Comp. L. § 750.227.

Petitioner challenges his convictions on two grounds:

I. A writ of habeas corpus should issue where trial counsel rendered ineffective assistance when counsel failed to investigate and call any exculpatory 5:30 p.m. alibi witnesses or ask of any alibi witnesses the whereabouts of Petitioner at 5:30 p.m., [whose] testimony would have completely exonerated Petitioner.

II. Petitioner is entitled to habeas relief because he was denied due process to a fair trial when false, misleading, and perjured testimony, known by the prosecution, infiltrated the trial and the trial court allowed it to happen, thus, retrial should be barred under the double jeopardy provision of the constitution. Alternatively, if retrial is ordered it should be held without any in-court identification from prosecution's witness Damia Johnson.

Supp. Pet. at PageID.373–374 (Dkt. 21); see also Pet. Request at PageID.6936 (Dkt. 27) (confirming Petitioner's intention to raise only these two claims).

## I. BACKGROUND

Orlando Miller was shot to death while walking along a residential street in Detroit between 5:30 and 5:40 p.m. on May 6, 2007.  Police had information suggesting that Miller had been at the scene of the murder of Petitioner's brother, Avery Akram, a week earlier, so they suspected a connection between the two crimes.

About two months after the shooting, Lawrence Archer contacted the police. Archer told investigators that he witnessed Miller's shooting while he was inspecting a nearby house.  Archer said a man ran past him and then quickly walked up to Miller and a woman. The man produced a revolver and shot Miller once in the chest, and then he shot Miller multiple times after Miller fell to the ground.

Archer was shown a photographic lineup, and he identified Petitioner as the shooter. Archer said he realized Petitioner was the shooter as he drove away from the scene, when he recalled that Petitioner was the man from whom he had bought DVDs  on the street a few times.  Archer initially did not want to get involved, but his wife eventually convinced him to go to the police.

Unlike Archer, Damia Johnson, who was the woman who had been walking with Miller, could not identify the shooter for police.  Nevertheless, she claimed to later recognize Petitioner as the shooter shortly before trial when she replayed the incident in her memory. She explained that she was in shock at the time of the shooting and for a few days afterward.

Other than Archer's and Johnson's identification of Petitioner as the shooter, no evidence connected Petitioner to Miller's murder.

Petitioner was eventually tried three times.  Because Petitioner claims that his counsel was ineffective for failing to call alibi witnesses at his third trial, it is necessary to summarize evidence presented at each trial.

At the first trial, held in 2007, the prosecution presented identification testimony from Archer and Miller. The prosecutor also attempted to present evidence of a motive.  But evidence that Miller was at the scene of Avery Akram's murder was struck when the prosecutor failed to offer any evidence that Petitioner believed Miller to be involved in Avery's murder.  The defense did not present any alibi witnesses.  The jury found Petitioner guilty of the charged offenses.

On appeal, Petitioner's appellate counsel successfully moved for a remand to the trial court for an evidentiary hearing on the claim that Petitioner's trial counsel was ineffective for failing to call alibi witnesses.

At the evidentiary hearing, defense counsel Marlon Evans testified that Petitioner told Evans from the beginning of the case that, at the time of the incident, Petitioner was at a funeral home for his deceased brother's viewing.  2/11/2009 Hr'g Tr. at 6 (Dkt. 23-10).  Petitioner provided names of several people who would corroborate the alibi, but Evans decided not to investigate the defense.  Id. at 6–8.  Evans explained that in his eighteen years of experience, he had never had much success with alibi defenses that relied on friends or family members.  Id. at 15.

Raquel Akram, Petitioner's sister-in-law, testified that on May 6, 2007, she attended the viewing of Avery Akram's body at the Swanson Funeral Home in Detroit, which is six miles from the scene of Miller's murder. Id. at 44, 54.  She arrived at the funeral home at about 4:45 p.m.  Id. at 43–45.  At 5:30 p.m. she followed a friend outside the funeral home and saw Petitioner near the lobby as she and her friend walked past him.  Id. at 46–47.  She saw Petitioner again inside the front of the funeral home at about 6:00 p.m., when she walked another friend outside. Id. at 46.

Andre Akram, Raquel's husband and Petitioner's brother, made the arrangements for the viewing. Andre was inside the funeral home for most of the memorial service, which lasted from

3:00 to 7:00 p.m.  Id. at 22, 25.  Andre was primarily occupied with other friends and family members, but he recalled seeing Petitioner at the funeral home two or three times.  Id. at 25–27. On cross-examination, Andre acknowledged that he did not "kee[p] tabs" on Petitioner.  Id. at 29. Nor did Andre know the exact time Petitioner left the funeral home.  Id.

 Kamilah Helton, Avery's fiancée, also attended the viewing.  She testified that she saw Petitioner at the funeral home when she arrived a little after 4:00 p.m.  Id. at 35.  She went outside about three times that evening, and each time she passed by Petitioner, who was standing in the lobby.  Id. at 37.  Petitioner was still there when Helton left, which was between 6:30 and 6:45 p.m.  Id.  On cross-examination, Helton testified that she did not "kee[p] tabs" on Petitioner the whole time that she was there.  Id. at 39.  At some point, Petitioner spoke to her briefly, but she did not know what time that happened.  Id.  She never saw Petitioner leave the funeral home.  Id.

Antone Webb was a friend of the Akram family.  He arrived at the viewing between 4:00 and 4:15 p.m., where he saw Petitioner inside the funeral home lobby.  Id. at 54.  Webb recalled that Petitioner was in the lobby in front of the chapel the entire time.  Id. at 56.

James Hunter, Avery's best friend, arrived at the viewing at 4:15 or 4:20 p.m.  Id. at 63. He saw Petitioner in the lobby when he arrived.  Id.  He spent the rest of the service outside with Webb.  Id. at 64.  He saw Petitioner standing in the lobby and doorway of the funeral home and never saw him leave.  Id. at 65.  On cross-examination, Hunter testified that Petitioner was in his line of sight most of the time that he was there.  Id. at 66.  But he denied that he watched Petitioner the whole time.  Id.  He testified that there were times that he did not see Petitioner because he was in a different part of the premises.  Id.

The trial court denied Petitioner's motion for a new trial based on the alibi witnesses' testimony.  The case then returned to the Michigan Court of Appeals, which reversed the trial

court's decision, finding that Petitioner was deprived of the effective assistance of counsel for his attorney's failure to call alibi witnesses at trial. People v. Akram, No. 315402, 2015 WL 1814038, at *2–*3 (Mich. Ct. App. Apr. 21, 2015). The prosecutor appealed, but the Michigan Supreme Court denied leave to appeal. People v. Akram, 793 N.W.2d 240 (Mich. 2011).

Petitioner's second trial was held in August of 2011. Prior to trial, Petitioner's new trial counsel filed a notice of alibi that listed twelve witnesses, including the five who testified at the evidentiary hearing. Counsel called only two of the alibi witnesses at trial: Andre Akram and Raquel Akram.

Following the presentation of the prosecutor's case, Andre testified that he was at the viewing from 3:00 to 7:00 p.m. 8/16/11 Jury Trial Tr. at 199 (Dkt. 23-26). Petitioner arrived about an hour to an hour and one-half after Andre arrived. Id. at 200. Andre saw Petitioner two or three times between 4:30 and 7:00 p.m. Id. at 201. On cross-examination, Andre conceded that he knew his brother was on trial for murder, he knew the time of the murder, he knew who his brother's lawyer was, but he did not go to the attorney or police about the alibi. Id. at 202–206, 216–217. Andre thought about one hundred people might have attended the viewing. Id. at 213. Andre was not "keeping tabs" on Petitioner during the viewing. Id. at 214. He was not aware of Petitioner leaving, but he could not say that he saw Petitioner at 5:30 p.m. Id. at 214–215.

Raquel Akram testified that she arrived at the viewing around 4:45 p.m. Id. at 225. She saw Petitioner as she walked her friend out of the funeral home at about 5:30 p.m. Id. at 226–228. Petitioner was standing near the doorway. Id. at 227. Raquel saw him again later outside around 6:00 p.m. Id. at 228. On cross-examination, Raquel testified that she did not tell anyone about her brother's alibi at the time of his original trial because she assumed his lawyer would contact her. Id. at 234. She estimated that between 50 and 75 people attended the viewing. Id. at 236. She did

not actually look at the time when her friend left, but her friend had told her that she had to leave at 5:30 p.m.  Id. at 239.

The second trial ended with a hung jury.  8/31/11 Jury Trial Tr. at 21–22 (Dkt. 23-33).

Petitioner's third trial was held in May of 2012.  Petitioner was represented by the same attorney who handled his second trial.  Counsel again filed a notice of alibi that listed eleven of the witnesses listed in his previous notice of alibi.  Notice of Alibi, in Mich. Ct. App. 315402 at PageID.5446–5447 (Dkt. 23-58).  After the prosecutor rested, defense counsel presented the same two alibi witnesses, Raquel and Andre Akram, as well as a new witness, Jamillah Gross-Caldwell.

Gross-Caldwell testified that she was a college friend of Raquel and Andre.  5/15/12 Jury Trial Tr. at 96–97 (Dkt. 23-50).  She recalled attending the viewing for Avery Akram.  Id. at 98–99.  The viewing was from 3:00 to 7:00 p.m., but she did not arrive until the later part of it. Id. at 99–100.  She remembered seeing Petitioner at the funeral home. Id. at 104.  On cross-examination, Gross-Caldwell testified that she did not know the exact time that she arrived at the viewing.  Id. at 116.  On questioning by the jury, Gross-Caldwell stated that she did not speak to Petitioner during the viewing, and she could not give a more exact time when she arrived or left.  Id. at 120.

Andre Akram again testified that he saw Petitioner at the viewing two or three times between 3:00 and 7:00 p.m.  Id. at 128.  On cross-examination, he indicated that between 50 and 100 people attended the viewing.  5/16/12 Jury Trial Tr. at 32 (Dkt. 23-51).  Andre was not "keeping tabs" on the comings and goings of individuals who attended.  5/17/12 Jury Trial Tr. at 11 (Dkt. 23-52).  He acknowledged that he did not recall seeing Petitioner specifically at 5:30 p.m. Id.  Andre did not tell Petitioner's first attorney about seeing Petitioner at the viewing or go to the police.  Id. at 12–13.  Andre remembered seeing Petitioner before 5:30 p.m., but he did not specifically recall seeing him after 5:30 p.m.  Id. at 33.

6

Raquel Akram again testified that she arrived at the viewing around 4:45 p.m.  Id. at 50.

She did not see Petitioner when she first got there.  Id. at 53.  She did, however, see Petitioner

twice between 4:45 and 7:00 p.m.  Id.  The first time was when she walked her friend Jamillah to

Jamillah's car.  Id. at 60.  The second time was when she walked another friend, Juan, out to his

car at around 6:00 p.m.  Id. at 60–61.  On cross-examination, Raquel acknowledged that she did

not look at any clocks at the times that she saw Petitioner at the funeral home.  Id. at 61–63.

The jury found Petitioner guilty of the charged offenses.

Following sentencing, Petitioner again filed a direct appeal. His appellate counsel filed a

brief on appeal that raised four claims:

> I. Was Defendant denied the effective assistance of counsel when trial counsel
> failed to investigate and present alibi witnesses for the exact time of the murder?
>
> II. Was Defendant denied due process to a fair trial when perjured testimony,
> known by the prosecution, infiltrated the trial and the trial court allowed it to
> happen?
>
> III. Did the trial court err in denying the suppression of eyewitness identification
> when the eyewitness testimony was unreliable and the identification procedure
> unduly suggestive?
>
> IV. Was Defendant denied due process to a fair trial when the prosecution
> improperly withheld key evidence of the line-up procedure and withheld key
> evidence of witness(es)['] perjury?

Petitioner also filed pro se motions to remand for another hearing, as well as a supplemental

brief that raised the following additional claims:

> I. The appeals court erred and denied Defendant due process when the court denied
> Defendant's motions for "Ginther," "Wade," "Giglio," and "Brady" evidentiary
> hearings.
>
> II. Was Defendant deprived of his constitutional rights under double jeopardy
> where prosecutor used in trial by second tribunal perjured testimony knowingly to
> avoid an acquittal she believed imminent?

7

III. Was Defendant denied his constitutional rights under confrontation clause where trial court denied defense impeachment of prosecution's key witness with prior perjury?

IV. Was Defendant denied due process and fair trial where trial court denied sequester of police officer witness to avoid any tailoring of witness' testimony?

The Michigan Court of Appeals affirmed in an unpublished opinion. Akram, 2015 WL 1814038. Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising what now form his two habeas claims as well as a few additional claims. The Michigan Supreme Court denied the application by standard form order. People v. Akram, 873 N.W.2d 591 (Mich. 2016).

Petitioner then filed his current habeas petition. He later filed a motion to stay proceedings so that he could return to state court to exhaust additional claims (Dkt. 10). The Court granted the motion (Dkt. 11). Following state post-conviction proceedings, Petitioner filed amended habeas petitions (Dkts. 13, 15). The Court reopened the case and ordered a response (Dkt. 17). Petitioner later filed documents clarifying that he wished to raise only the two issues referenced above. Supp. Pet. at PageID.373–374 (Dkt. 21); see also Pet. Request at PageID.6936 (confirming Petitioner's intention to raise only these two claims.)

## II. STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d)(1). Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law. Id.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [United States Supreme Court cases]' or if it 'confronts

8

a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15–16 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405–406 (2000)).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. at 102–103 (internal quotation omitted). As a condition for obtaining habeas relief from a federal court, the state prisoner must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

### III. DISCUSSION

#### A. Habeas Petition

The Court discusses each of Petitioner's claims for relief in turn.

#### 1. Ineffective Assistance of Counsel

Petitioner's lead claim asserts that his trial counsel was ineffective for failing to call four alibi witnesses—Kamilah Helton, Antonio Webb, James Hunter, and Adonis Akram—at his third

trial to elicit testimony that he was seen at the funeral home specifically at 5:30 p.m., the time of Miller's murder. He asserts that the three alibi witnesses who testified at his third trial were unable to testify that they saw him at the specific time of the murder, creating a hole in the defense that the additional witnesses would have closed.

After reciting the familiar standard governing claims of ineffective assistance of counsel, the Michigan Court of Appeals denied the claim on the merits as follows:

> Defendant contends that defense counsel was ineffective for failing to investigate and present alibi witnesses "for the exact time of the murder."
>
> After defendant's first trial, the trial court held a <u>Ginther</u> hearing in February 2009, during which defendant presented five alibi witnesses to show that at the time of the shooting he was attending a viewing for his brother, Avery, from 3:00 to 7:00 p.m. at the Swanson Funeral Home. Defendant presented: (1) his brother, Andre; (2) his sister-in- friend, James Hunter; (3) Avery's friend, Antone Webb; (4) Avery's and (5) Avery's fiancée, Kamilah Helton. All five witnesses testified that they saw defendant at the viewing at the time of the shooting. After the <u>Ginther</u> hearing, this Court ordered a new trial based on former defense counsel's failure to present an alibi defense. Defense counsel was not involved in the <u>Ginther</u> hearing. Defense counsel represented defendant at his second jury trial in August 2011. On June 27, 2011, defense counsel filed a notice of alibi, indicating that defendant was at the funeral home at the time of the shooting. The notice listed 12 witnesses, including the five who testified at the <u>Ginther</u> hearing. Ultimately, defense counsel called Andre and Raquel Akram at the second trial. The second trial ended in a mistrial, and a third trial was scheduled.
>
> Before defendant's third trial, defense counsel filed a notice of alibi and a witness list, both of which included the same witnesses listed in the previously filed notice of alibi, with the exception of Hunter (who had testified at the <u>Ginther</u> hearing and did not testify at defendant's second trial). During the third trial, defense counsel again called Andre and Raquel to testify in support of the alibi defense, as well as Gross–Caldwell—a college friend of André's and Raquel's. All three witnesses testified that they observed defendant at the funeral home, but no witness testified to observing defendant at the exact time of the shooting, i.e., between 5:30 and 5:40 p.m.
>
> Defendant now argues that defense counsel should have called additional alibi witnesses, who could have placed him at the funeral home at exactly 5:30 p.m. In his appellate brief, defendant does not provide the names of the additional witnesses he believes defense counsel should have called. In his related motion to remand, defendant named the three other witnesses who previously testified at the <u>Ginther</u>

hearing, Helton, Hunter, and Webb.  Defendant attached to his motion to remand affidavits of two of those three witnesses, Helton and Hunter, as well as his own affidavit and the affidavit of his nephew, Adonis Akram.  In her affidavit, Helton averred that she was at the funeral home on May 6 and observed defendant at 5:30 p.m., which was the exact time of the shooting, she was able and willing to testify but was not contacted by defense counsel.  Adonis averred in his affidavit that he observed defendant, his uncle, at the funeral home between 5:30 and 5:40 p.m. and was willing to testify that his uncle did not commit the murder.  Hunter also averred that he observed defendant at the funeral home specifically from 5:30 to 5:40 p.m. and that he wanted to testify at defendant's trial, but was not interviewed by defense counsel.  Finally, defendant submitted his own affidavit, averring that when he asked defense counsel "to call more witnesses" "to testify to the time of the incident," defense counsel responded, "Why, you already won."

Defendant has not overcome the strong presumption that defense counsel chose not to call the additional witnesses as a matter of trial strategy. Counsel's decisions about whether to call witnesses are matters of trial strategy, People v. Rockey, 237 Mich. App. 74, 76; 601 NW2d 887 (1999), and "this Court will not second-guess defense counsel's judgment on matters of trial strategy." People v. Benton, 294 Mich. App. 191, 203; 817 NW2d 599 (2011).  Defense counsel has wide discretion as to matters of trial strategy.  People v. Heft, 299 Mich. App. 69, 83; 829 NW2d 266 (2012).  The failure to present a witness can constitute ineffective assistance only where it deprives the defendant of a substantial defense.  People v. Payne, 285 Mich. App. 181, 190; 774 NW2d 714 (2009).

Defendant has not overcome the presumption that defense counsel purposely declined to call defendant's nephew, his deceased brother's fiancée, and two of his brother's friends as a matter of sound trial strategy.  It is apparent that counsel was aware of these witnesses because counsel listed them on his notice of alibi that he filed before trial.  It is also apparent that counsel was aware of the testimony of at least Helton, Webb, and Hunter because each of those witnesses testified at the previous Ginther hearing and counsel referred to the Ginther hearing testimony during the lower court proceedings.  The failure to call an alibi witness does not constitute ineffective assistance of counsel if counsel reasonably believes that the purported alibi witness will not provide an effective alibi.  People v. McMillan, 213 Mich. App. 134, 141; 539 NW2d 553 (1995).

Defense counsel reasonably may have believed that calling the four additional alibi witnesses would have been a risky proposition.  It would have been reasonable for counsel to anticipate that the prosecutor would question the credibility of those witnesses, and counsel reasonably may have determined that the credibility issues that those witnesses would have presented would seriously undermine any progress defense counsel had made in presenting the alibi defense and discrediting the prosecution's witnesses.  The testimony from the prior Ginther hearing supports that there were obvious credibility issues with the proposed witnesses, whose testimony sometimes contradicted each other regarding defendant's whereabouts.

> It was not objectively unreasonable for defense counsel to present those whom he
> believed were the strongest and most consistent alibi witnesses.   Counsel
> reasonably may have believed that if the four proposed witnesses, who all claimed
> to have observed defendant's whereabouts at exactly 5:30 p.m., were perceived to
> be lying, the jury was more likely to disregard the other alibi testimony.  "The fact
> that defense counsel's strategy may not have worked does not constitute ineffective
> assistance of counsel."  People v. Stewart (On Remand), 219 Mich. App. 38, 42;
> 555 NW2d 715 (1996).   Consequently, defendant has failed to overcome the
> presumption that defense counsel provided effective assistance at trial.

Akram, 2015 WL 1814038, at *2–*3.

This decision did not unreasonably apply clearly established Supreme Court law. In

Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for

determining whether a habeas petitioner received ineffective assistance of counsel. First, a

petitioner must show that counsel's performance was deficient.  Id. at 687.  This requires showing

that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed

by the Sixth Amendment. Id. Second, a petitioner must establish that counsel's deficient

performance prejudiced the defense.  Id.  This requires showing that counsel's errors were so

serious that they deprived the petitioner of a fair trial or appeal.  Id.

As to the first element, a petitioner must identify acts that were "outside the wide range of

professionally competent assistance" to prove deficient performance.  Id. at 690.  The reviewing

court's scrutiny of counsel's performance is highly deferential.  Id. at 689. Counsel is "strongly

presumed to have rendered adequate assistance and made all significant decisions in the exercise

of reasonable professional judgment."  Id. at 690. The petitioner bears the burden of overcoming

the presumption that the challenged actions were sound trial strategy.  Id. at 689.  As to the second

element, a petitioner proves prejudice by showing that "there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

694.  A reasonable probability is one that is sufficient to undermine confidence in the outcome.

Id. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." Id. at 686.

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by Strickland and 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (punctuation modified). "When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

The record reasonably supports the state court's determination that counsel did not perform deficiently. In light of the extensive record established at the evidentiary hearing and three trials, the appellate court laid out a plausible rationale for counsel's decision to limit the presentation of the alibi defense in the manner that he did. See Harrington, 562 U.S. at 105. Defense counsel was not operating in a vacuum. Prior to the third trial, he had the benefit of five alibi witnesses' testimony from the evidentiary hearing. Counsel also had the benefit of knowing the alibi testimony of the two alibi witnesses who testified at the second trial and how they would be challenged on cross-examination. Perhaps more significantly, counsel knew that the presentation of the two alibi witnesses at the second trial resulted in a hung jury. Finally, contrary to Petitioner's assertions, counsel knew of the possibility of calling the additional alibi witnesses, as he listed their names (including the new witness, Adonis Akram) in the notice of alibi filed before both the second and third trials.

Petitioner argues that the failure to call the additional alibi witnesses was deficient because these witnesses, unlike Raquel and Andre Akram, would have testified to seeing Petitioner at the specific time of the murder.  Petitioner therefore sees the choice whether to present these additional witnesses as an easy one to make, and that any competent attorney would have presented the witnesses.  The record, however, shows that the situation was not nearly as cut and dried.

Three of the four uncalled witnesses testified at the evidentiary hearing. Contrary to Petitioner's assertion, and contrary to the statements in their terse affidavits, none of them testified to seeing Petitioner at the exact time of the murder.  Helton testified that she was at the viewing between 4:00 p.m. and 6:30–6:45 p.m. and saw Petitioner about three times during that span. 2/11/2009 Hr'g Tr. at 35–38.  But when asked what time it was that she saw Petitioner, Helton testified, "I can't say I was keeping tabs . . . I can't say.  I don't remember the time.  Exactly what time." Id. at 39.

Antone Webb testified that he arrived at the viewing around 4:00 p.m. and stayed until the end of the service.  Id. at 54.  He testified that he saw Petitioner throughout the whole time he was there and never saw Petitioner leave.  Id. at 54, 56.  But Webb clarified that while Petitioner stayed in the lobby of the chapel, Webb was with "a whole bunch" of people from the neighborhood outside in the parking lot.  Id. at 54–56.

James Hunter also testified that he was at the viewing from about 4:15–4:20 p.m. until 7:00 p.m.  Id. at 63.  He saw the body and spoke to Petitioner soon after he arrived.  Id. at 63–64.  And though Hunter testified that he never saw Petitioner leave and saw Petitioner a "majority of the time," id. at 65–66, he clarified that he was in the parking lot with Webb, that he was not just watching Petitioner the whole time he was there, and that there were times he did not see Petitioner. Id. at 64–66.

14

Accordingly, the three uncalled witnesses who testified at the hearing and were subjected to even the briefest of cross-examinations left open the possibility that they did not observe Petitioner at the funeral home at the specific time of the murder. While they all claimed to see Petitioner during the course of the three- to four-hour viewing, none of them testified to any specific observation or event at the time of the murder during which they could say they also saw Petitioner.

Consequently, Raquel Akram was such an important witness for the defense. Of all the witnesses to testify, only Raquel testified to a basis for remembering why she saw Petitioner at the specific time of the murder. She explained that she knew her friend had to leave the viewing around 5:30 p.m. When she walked her friend out to her friend's car, she recalled passing Petitioner in the front of the funeral home. While this testimony suffered from the fact that Raquel conceded that she believed it be 5:30 p.m. only because her friend told her in advance that was the time she had to leave, at least this testimony connected a particular event with someone's observation of Petitioner at the time of the murder. None of the other alibi witnesses offered that sort of connection.

Calling the additional alibi witnesses opened the door for the prosecutor to point out inconsistencies between their testimony and Raquel's recollection. For example, Hunter testified at the hearing that Raquel escorted her to see the body somewhere between 4:15 p.m. and 4:20 p.m. Id. at 63. Raquel, however, testified that she took Hunter (known to her as "Blue") to see the body around 5:30 p.m., just after she walked her friend to her car. Id. at 45–46. Presenting Hunter's testimony, therefore, would have carried the risk of calling into question Raquel's recollection that it was around 5:30 p.m.—and not an hour earlier—when she walked her friend to her friend's car. Similarly, Helton and Webb testified that Petitioner remained inside the lobby,

while Raquel testified that she saw Petitioner outside the funeral home at around 6:00 p.m.  Id. at

47.  Presenting the additional witnesses might have presented opportunities for the prosecutor to

further challenge Raquel, whom defense counsel likely considered the key alibi witness, or at least

considered a witness who helped prevent a guilty verdict after the second trial.

This leaves the threadbare affidavit of Adonis Akram, Petitioner's nephew, which was

executed over six years after the murder.  Adonis does not explain in his affidavit why he did not

come forward earlier.  The affidavit merely states that Adonis saw Petitioner "at 5:30 thru 5:40

p.m.," that Petitioner "never left the funeral home," and that Adonis was "looking at him" at the

time of the murder.  Supp. Pet. at PageID.469.  Unlike Raquel, Adonis gives no explanation as to

why or how he could recall that he saw his uncle during a specific ten-minute window (that just

happened to be the time a murder was being committed) during a crowded viewing at a funeral

home six years earlier.  In fact, the affidavit includes nothing but unadorned, conclusory assertions.

The affidavit does not present compelling or persuasive evidence that counsel performed

deficiently by failing to call Adonis in addition to the three alibi witnesses that were called at the

third trial.

Defense counsel apparently believed that a jury was unwilling to convict Petitioner after

Raquel and Andre presented their alibi testimony.  It was reasonable for him to stick with this trial

strategy and opt against including several additional alibi witnesses whose testimony might have

been as risky as potentially beneficial.  In fact, the third alibi witnesses added by defense counsel

for the final trial, Gross-Caldwell, did not contradict anything testified to by Raquel or Andre,

suggesting a deliberate and selective strategy on whom to call.

Given this extensive record, and applying the appropriate habeas standard of review, the

Court finds that the Michigan Court of Appeals did not unreasonably apply the Strickland standard

16

by finding that Petitioner failed to overcome the presumption of effective performance. Therefore, Petitioner fails to demonstrate entitlement to relief based on his ineffective assistance of counsel claim.

## 2. False Evidence

Petitioner's second claim asserts that the prosecutor knowingly presented false testimony from Damia Johnson. Supp. Pet. at PageID.413. Specifically, he claims that Johnson testified at the first trial that she did not look at the face of the man who shot Miller. Petitioner notes that Johnson also told police officers after the shooting that she did not see the shooter's face. Petitioner alleges that the prosecutor presented false testimony at the third trial by eliciting contradictory and false testimony from Johnson that she saw the shooter's face. Petitioner states that, in its opinion, the Michigan Court of Appeals failed to address this particular allegation, which was part of a broader false evidence claim, entitling him to de novo review.[1] Id. at PageID.413–417.

The Michigan Court of Appeals rejected the claim on the merits:

Defendant highlights instances where Johnson's testimony about the circumstances surrounding her identification of him at his third trial differed from her testimony in prior trials or was contradicted by another witness, Detroit Police Sgt. Kevin Hanus, to argue that the prosecutor knowingly used perjured testimony at trial. The inconsistencies identified by defendant do not establish that the prosecutor knowingly used perjured testimony to obtain defendant's convictions. Gratsch, 299 Mich. App. at 619; People v. Parker, 230 Mich. App. 677, 690; 584 NW2d 753 (1998). Although Johnson's testimony regarding certain details differed from her prior testimony, there is no indication that the prosecutor sought to conceal these inconsistencies from defendant. In fact, the prosecutor noted some of the

---

[1] Petitioner raised this particular predicate to his false evidence claim in his pro se supplemental brief filed in the Michigan Court of Appeals. See Mich. Ct. App. 315402 at PageID.5753–5758. Appellate counsel's brief also attacked Johnson's testimony as false, but it contained a broader factual basis, i.e., it argued that Johnson's testimony changed over the course of the three trials and contradicted testimony from police officers. The brief stated that Johnson testified at the first trial that she did not see the shooter's face, but, in contradiction to officer testimony, she testified at the third trial that she identified Petitioner in the first of several photographic line-ups that occurred prior to the first trial. Id. at PageID.5713–5720.

inconsistencies during trial and, at one point, Johnson admitted that she was not able to remember "everything" after five years.

The prosecutor also questioned Sgt. Hanus about Johnson's "mistaken" testimony regarding a pretrial identification procedure in order to correct Johnson's testimony. In addition, testimony that conflicts with another witness's testimony does not automatically lead to the conclusion that the prosecution knowingly used perjured testimony. See People v. Lester, 232 Mich. App. 262, 278–279; 591 NW2d 267 (1998), overruled in part on other grounds, People v. Chenault, 495 Mich. 142; 845 NW2d 731 (2014). Defendant's argument does not involve an issue of perjury, but rather concerns witness credibility. Defense counsel fully explored the inconsistencies with Johnson's testimony, as well as other prosecution witnesses. The jury was free to believe or disbelieve all or any portion of their trial testimony. People v. Wolfe, 440 Mich. 508, 514; 489 NW2d 748 (1992), amended 441 Mich. 1201 (1992).

Akram, 2015 WL 1814038, at *4.

As an initial matter, the Court rejects Petitioner's argument that he is entitled to de novo review of the claim because the state court did not adjudicate the claim on the merits. While the state court did not specifically discuss Johnson's testimony regarding whether she saw the shooter's face, the court indicated it was reviewing Petitioner's challenge to "Johnson's testimony about the circumstances surrounding her identification of him at his third trial," which Petitioner argued "differed from her testimony in prior trials or was contradicted by another witness." Id. There is a presumption that a state court adjudicated a claim on the merits. Harrington, 562 U.S. at 98-99; Johnson v. Williams, 568 U.S. 289 (2013). Johnson's testimony in the third trial that she saw the shooter's face was part of her identification testimony. Petitioner has not overcome the presumption of a merits adjudication where the state court clearly indicated in its opinion that it was addressing Petitioner's challenge to the presentation of Johnson's identification testimony.

The state court decision did not unreasonably apply clearly established Supreme Court law. Prosecutors "may not knowingly present false evidence." United States v. Fields, 763 F.3d 443, 462 (6th Cir. 2014). The Supreme Court has stated that "deliberate deception of a court and jurors

by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" Giglio v. United States, 405 U.S. 150, 153 (1972) (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935)). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue v. Illinois, 360 U.S. 264, 269 (1959). But "[t]o prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." Rosencrantz v. Lafler, 568 F.3d 577, 583–584 (6th Cir. 2009). Petitioner must demonstrate that the testimony in question was "indisputably false" and that the alleged perjury was not harmless error. Monea v. United States, 914 F.3d 414, 421 (6th Cir. 2019).

At Petitioner's first trial, Johnson initially testified that she was not looking at the shooter's face when the victim was shot. 11/5/2007 Jury Trial Tr. at 173, 176 (Dkt. 23-4). She testified that the first time she was able to identify the shooter was at the trial itself. Id. at 161. When asked on cross-examination how she was able to identify Petitioner if she did not see his face, Johnson said, "'cause I remember what happened." Id. at 178. Johnson then attempted to explain that in the first few days after the shooting, she could not identify Petitioner because she was in shock, but at trial she was no longer in shock. Id. at 185, 213–214, 216. Sometime prior to trial, she was able to better think about what happened and could identify the shooter based on his eyes and nose. Id. at 226–227.

Then, at Petitioner's third trial, Johnson testified that as the shooter approached, he did not have anything obstructing his face. 5/9/12 Jury Trial Tr. at 114 (Dkt. 23-47). She testified that she looked at the shooter and the victim. Id. at 117. She identified Petitioner as the person she saw shoot the victim. Id. at 122. She testified she was in shock and just guessed at a general

description of the shooter when questioned by police. Id. at 124. And she acknowledged that she was unable to identify Petitioner in a photo array a few days after the shooting because she was scared. Id. at 133–136. But Johnson stated that she now recognized Petitioner from his face. Id. at 134–135. She was now better able to visualize what had happened. Id. at 172–173; 5/10/12 Jury Trial Tr. at 4–5 (Dkt. 23-48). On cross-examination, defense counsel vigorously and relentlessly impeached Johnson with her prior testimony that she did not look at the shooter's face at the time of the incident and with her inability to describe or identify the shooter for police. Id. at 31–40.

On a surface level, Johnson's testimony at the first trial seems internally inconsistent. She testified both that she did not see the shooter's face but also that she later recalled the shooter's face when the shock of the event wore off. The apparent inconsistency was somewhat resolved by Johnson at the first trial when questioned by defense counsel, and it became clearer during the third trial what Johnson was trying to describe, however inarticulately. Reading all her testimony together, it appears Johnson was attempting to say that she simply could not recall seeing the shooter's face until after time had passed, the shock wore off, and she was better able to reflect on the event. Indeed, when defense counsel challenged her on the inconsistency, that is how she attempted to respond. Therefore, although Johnson's credibility and the accuracy of her memory were obviously called into serious question by her uncertain and apparently equivocal testimony, the apparent inconsistency does not compel the conclusion that the prosecutor knew any particular part of her testimony was false. Mere inconsistencies in a witness' testimony do not establish the knowing use of false testimony. See United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir. 1989). The prosecutor might have reasonably believed that Johnson's prior testimony referred to

her failure to remember seeing the shooter's face until after she reflected back on the incident shortly before the first trial.

Petitioner has, therefore, not shown that Johnson's testimony was "indisputably false," Monea, 914 F.3d at 421, or that the prosecutor knowingly presented false testimony. The record reasonably allowed the Michigan Court of Appeals to reject Petitioner's claim consistent with the requirements of clearly established federal law. Petitioner is not entitled to habeas relief on his false evidence claim.

Petitioner fails to demonstrate entitlement to habeas relief with respect to either of his claims. Therefore, the Court denies the petition for writ of habeas corpus.

## B.  Certificate of Appealability

Before Petitioner may appeal this decision, the Court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (punctuation modified). The Court finds that reasonable jurists would not debate the resolution of any of Petitioner's claims. Therefore, the Court denies a certificate of appealability.

## C.  Leave to Proceed In Forma Pauperis on Appeal

While a certificate of appealability may be granted only if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant an application for leave to proceed in forma pauperis on appeal if it finds that an appeal can be taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(2). "Good faith" requires a showing that the issues raised are

21

not frivolous; it does not require a showing of probable success on the merits.  Foster v. Ludwick,

208 F. Supp. 2d 750, 765 (E.D. Mich. 2002).  Although jurists of reason would not debate the

Court's resolution of Petitioner's claims, the issues are not frivolous.  Therefore, an appeal could

be taken in good faith, and Petitioner may proceed in forma pauperis on appeal.  Id.

## IV. CONCLUSION

For the reasons set forth above, the Court denies with prejudice the petition for writ of

habeas corpus, declines to issue a certificate of appealability, and grants Petitioner leave to proceed

in forma pauperis on appeal.


SO ORDERED.


Dated: October 20, 2022                    s/Mark A. Goldsmith
      Detroit, Michigan                  MARK A. GOLDSMITH
                                  United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 20, 2022.

                                    s/Karri Sandusky
                                    KARRI SANDUSKY
                                    Case Manager